**Edmund Earl REEVES, Appellant,**

v.

**Lawrence E. WILSON, Warden, California State Prison, San Quentin, California, Appellee.**

**No. 22064.**

United States Court of Appeals Ninth Circuit.

May 21, 1968.

Frederic Campagnoli (argued), San Francisco, Cal., Mary E. Montgomery, Berkeley, Cal., for appellant.

John Murphy (argued), Derald E. Granberg, Deputy Attys. Gen., Thomas C. Lynch, Atty. Gen. of California, for appellee.

Before MERRILL and DUNIWAY, Circuit Judges, and CRARY, District Judge.

MERRILL, Circuit Judge:

This appeal is from an order of the District Court for the Northern District of California, following evidentiary hearing, denying appellant's petition for writ of habeas corpus.

Appellant is under sentence of death for first-degree murder. The sole ground asserted for issuance of the writ was inadequate representation by counsel.

Appellant was indicted by the grand jury of Kern County, California, on April 1, 1965. A transcript of the proceedings shows that Paul Leslie Pugh there testified as an eyewitness.

He testified that on March 24, 1965, he was employed as a field gauger for Standard Oil Company. At approximately 9:00–9:30 a. m. he and Floyd Parsons, another oil field worker, drove in separate cars to the New Hope lease located 18 miles north of Bakersfield. Upon arrival Pugh observed a 1959 Ford vehicle near a toolhouse on the lease.

Appellant was outside the car, by the open car trunk, pouring something from a five-gallon can into another can in the trunk of his car.

Pugh and Parsons parked their cars by the field office and as Pugh started his work he saw Parsons walking in the direction of the Ford. Shortly thereafter Pugh heard what he thought was Parsons walking up behind him. Turning around he saw appellant holding a gun. Appellant told Pugh to raise his hands and Pugh complied. Parsons was standing about three feet from appellant and already had his hands up. Pugh said "What do you want?", and appellant responded, "Unload your pockets and throw it on the ground." Pugh threw down his wallet containing about $145 and some small change; Parsons put down a fifty-cent piece, two dimes and a pocket knife.

Appellant directed the men to "turn around and start walking." As the men approached two tanks, Pugh started to go to the right and Parsons started to go to the left. Appellant, gesturing with his pistol, ordered Pugh to the left with Parsons. They came to a narrow area under a catwalk and Pugh's and Parsons' bodies touched. They were now hidden from the roadway. At this moment the gun reported, firing slowly, and Parsons' body lurched hard against Pugh. Pugh jumped around the tank, took a zig-zag course across the tank area and shielded himself behind a boiler. Pugh then ran towards the road and, as he looked over his shoulder toward the tank area, appellant fired twice at him. Pugh hid in a clump of brush.

Pugh watched appellant as he slowly walked back to the place where the men had been forced to put down their belongings and placed these items in his pocket. Appellant then rushed back to the Ford and drove off.

Pugh found Parsons' lifeless body by the tanks. He drove some six miles to the nearest phone and called the authorities who were on the scene in approximately 15 minutes.

Dr. Robert W. Huntington, a pathologist, testified that there were three bullet tracks through Parsons' body, one entering Parsons' back. The cause of death was a bullet wound of the heart.

Appellant was indicted on charges of murder and robbery. He was arraigned in the Superior Court of Kern County and counsel was appointed to represent him.

His story, as told to counsel, is that when Parsons and Pugh came upon him at the oil lease Pugh went about his business but Parsons picked up a piece of wood with which he attacked appellant. Appellant, in defense, secured his pistol from his car and ordered Parsons to drop the stick. He then ordered Pugh and Parsons to empty their pockets, since he wanted to get their car keys to prevent pursuit. When he ordered them to walk they started to separate, and when he ordered them to stay together Pugh ducked and ran. Out of the corner of his eye he saw Parsons lunging at him with what he thought was a length of pipe. He fired in self-defense.

His recital of counsel's efforts on his behalf is substantially as follows:

Counsel first urged him to plead guilty and when he refused, without any inquiry into his background, persuaded him to plead not guilty by reason of insanity. Under California law if, under such a plea, the defendant is found sane a guilty plea results.

Three psychiatrists were then appointed by the superior court to examine appellant. After examining him they filed reports finding him sane at the time of the shooting and at the time of their examination. Appellant's counsel had these reports prior to the sanity trial but never discussed them with appellant.

Counsel then (with appellant's concurrence) waived jury trial on the issue of insanity and stipulated that the issue be submitted to the court upon the doctors' reports without introduction of any further evidence. Further, when the court predictably found appellant sane, counsel stipulated that the issues of degree

and penalty be submitted on the grand jury testimony of Pugh plus appellant's past criminal record. The court determination of first-degree murder and penalty of death followed. Appellant concludes that his counsel stipulated him into the gas chamber.

The evidentiary hearing conducted by the court below (at which appellant, his trial counsel and the district attorney who had tried the case all appeared as witnesses) paints quite a different picture, simply by clarifying the context in which counsel's moves were made.

Appellant's counsel was thoroughly familiar with criminal trial practice, both as former prosecutor serving for seven years in the district attorney's office and as counsel for the defense in over 500 misdemeanor and felony matters. Through study of the grand jury transcript and conference with the district attorney, he was aware of the extent of the state's case against appellant. Pugh was an articulate and persuasive witness. Appellant was not. Appellant's version of the events leading to the shooting was further disproved by evidence secured on the state's careful examination of the scene. If the issue of guilt was to be tried there was, in counsel's view, simply no question of the outcome or the degree. What was at stake, and all that was at stake, was the extent of the penalty. There were no mitigating circumstances. Mercy of the judge was the only hope and the problem was how best to invoke it. To counsel's knowledge, the judge had never before on his own discretion imposed the death penalty.

Under these circumstances counsel believed that a confrontation between Pugh and appellant was to be avoided at all costs. Also to be avoided was an opportunity for the state to present inflammatory testimony through live witnesses or to cross-examine or impeach appellant, particularly before a jury. If the state could be confined to a cold and limited record; if appellant's side of the story could be presented to the court without the necessity for placing him on the witness stand, this, in counsel's judgment, was by all means to be the strategy.

This was accomplished. The grand jury transcript of Pugh's testimony was far from the full state case. The reports of the psychiatrists dealt with appellant's lack of schooling and background of poverty and related the occurrences as told to them by appellant. Appellant's story of the circumstances of the shooting and his unfortunate background were further emphasized in counsel's argument to the court.

Thus, the moves made in every instance were in adherence to strategy thoughtfully designed by experienced counsel. His representation, in our judgment, was more than adequate.

Affirmed.